UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VIRGINIA ANN WALLACE, | ) | Case No. 1:16cv2246 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | <u>REPORT AND RECOMMENDATION</u> |

Plaintiff Virginia Ann Wallace ( "Wallace" or "claimant") challenges the final decision of Defendant Commissioner of Social Security ( "Commissioner"), denying her applications for Child Disability Insurance Benefits ("DIB"), a Period of Disability, and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

The issue before the court is whether the final decision of the Commissioner is supported by substantial evidence and, therefore, conclusive. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be affirmed.

## I.  PROCEDURAL HISTORY

On June 4, 2013, Wallace applied for DIB and SSI benefits. (R. 11, PageID #: 241-251, 76, 223-230.) Wallace stated that she became unable to work because of her disabling condition on August 1, 2011. (*Id.* at 241, 223, 76.) Wallace's applications were denied initially and upon reconsideration. (*Id.* at 124-149, 150-177.) Thereafter, Wallace filed a written request for a hearing before an administrative law judge ("ALJ"). (*Id.* at 192-194.)

The ALJ convened a hearing on May 13, 2015, to hear Wallace's case. (R. 11, PageID #: 89-123.) Wallace appeared at the hearing, was represented by counsel, and testified. (*Id.* at 91-92.) A vocational expert ("VE") also attended the hearing and provided testimony. (*Id.* at 93, 116-121.) On September 18, 2015, the ALJ issued her decision, applying the standard five-step sequential analysis to determine whether Wallace was disabled. (R. 11, PageID #: 76-84; *see generally* 20 C.F.R. §§ 404.1520(a), 416.920(a).) Based on her review, the ALJ concluded Wallace was not disabled. (R. 11, PageID #: 76, 84.)

The Appeals Council denied Wallace's request for review, thus rendering the ALJ's decision the final decision of the Commissioner. (R. 11, PageID #: 60-62.) Wallace now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The parties have completed briefing in this case.

## II. PERSONAL BACKGROUND INFORMATION

Wallace was born on October 9, 1989, and was 21 years old as of her alleged disability onset date. (R. 11, PageID #: 241, 78.) Accordingly, Wallace was considered a "younger person" for Social Security purposes. *See* 20 C.F.R. § 404.1563(c). Wallace completed high school; and

is able to communicate in English. (R. 11, PageID #: 246, 244.) Wallace had no past relevant

work. (*Id.* at 83, 117.)

### III. RELEVANT MEDICAL EVIDENCE[1]

#### A. Treatment Records

Disputed issues will be discussed as they arise in Wallace's brief alleging errors by the

ALJ. As noted earlier, Wallace applied for disability benefits on June 4, 2013. (R. 11, PageID #:

241-251, 76, 223-230.) Wallace listed her physical or mental conditions that limit her ability to

work as "ADHD, clinical depression, emotional disturbances." (*Id.* at 245.)

According to a school Evaluation Team Report re-evaluation prepared on April 25, 2005,

Wallace was receiving special education services for a cognitive disability. (R. 11, PageID #:

297.) On July 28, 2005, Applewood Centers issued a Closing Summary regarding Wallace's ISP

goals and outcomes. (*Id.* at 331-334.) The summary noted "no change" in the goal of decreasing

irritability; some overall progress was noted, but she "continues to make poor choices

behaviorally at times." The summary stated Wallace was worse in her goal of increased hygiene

and self-care, and in addressing lying and irresponsible behaviors. *Id.* at 331. Wallace was

diagnosed with the following: PTSD; chronic, unspecified adjustment disorder; and major

depressive disorder in remission. *Id.* at 333.

Despite an alleged 2011 onset date, Wallace does not point to any treatment records

between 2005 and 2013. (R. 12, PageID #: 824; *see also* R. 11, PageID #: 81.) The ALJ notes

---

[1] The summary of relevant medical evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

3

that a significant portion of her 2013 treatment records address routine medical issues. (R. 11, PageID #: 81.)

At an April 23, 2013, medical examination with Sasha Yurglonas, M.D., a MetroHealth family practice doctor, Wallace reported that she had been diagnosed with ADHD at age 8 or 9. (R. 11, PageID #: 392.) She stated that her home life was stressful; her boyfriend lived with her family, she argued with him, and hit him. *Id.* She was told to pursue psychological counseling. *Id.* at 396.

On June 4, 2013, Wallace applied for disability benefits. On July 6, 2013, Wallace completed a "Function Report." (R. 11, PageID #:252-259.) Wallace stated that the conditions which limit her ability to work were "controlling anger, difficult time concentrating [and] following directions." She also reported forgetting what needs to be done within five minutes. (*Id.* at 252.) Wallace reported that, on a daily basis, she watched television with her family, and some friends come to visit. (*Id.* at 256.) She stated she goes to the rec center "once in a while." *Id.* Wallace noted that she had a "severe anger problem towards my family causing me to yell and scream at them." (*Id.* at 257.)

Wallace also reported difficulties completing tasks, concentrating, understanding and following instructions, and getting along with others. (R. 11, PageID #:257.) She stated she had a difficult time getting along with authority figures "because I don't like them telling me what to do." (*Id.* at 258.) Also, she stated that she does not handle stress or changes in routine well. *Id.*

During a July 31, 2013, mental health assessment, Wallace reported anger issues and hitting her boyfriend, to Sheeril Ratner, Ph.D. (R. 11, PageID #: 462.) Although Wallace was agitated and anxious, she was oriented to time, person, and place, and her thought process was organized, with tight association. Her judgment and insight were fair, she had good recent and

4

remote recall, and her attention span and concentration were sustained. *Id.* at 465. Dr. Ratner assessed Wallace with mood disorder, and set a treatment goal of controlling her anger. *Id.* at 466.

At a September 16, 2013, counseling meeting with Dr. Ratner, Wallace reported that she was ill with bronchitis, and was making no progress toward her treatment goal. (R. 11, PageID #: 661.) Wallace was restless, but she was oriented to time, person, and place, and her thought process was loosened, with tight association. Her judgment and insight were good, she had normal recent and remote recall, and her attention span and concentration were sustained. Dr. Ratner assessed that she was not a risk to herself or others. *Id.* at 662.

At an October 3, 2013, counseling meeting with Dr. Ratner, Wallace was making no progress toward her treatment goal, still reporting anger and stress issues. (R. 11, PageID #: 490.) Although Wallace was anxious and depressed, she was oriented to time, person, and place; her thought process was loose, with tight association. Dr. Ratner assessed that Wallace's judgment and insight were fair, she had normal recent and remote recall, and her attention span and concentration were sustained. Dr. Ratner indicated she was not a risk to herself or others. *Id.* at 491.

On February 3, 2014, Stacy Beard, Ph.D., conducted a mental health assessment of Wallace. Dr. Beard stated that Wallace needed a psychiatric referral to consider her medication needs. (R. 11, PageID #: 682, 686.) Wallace reported to Dr. Beard that she struggled with temper and anger problems, yelling, screaming, and hitting her boyfriend. She reported panic attacks, and anxiety. She also reported hallucinating that zombies were about to attack her. The panic attacks started a few months earlier, but had lessened in more recent weeks. Dr. Beard assessed that she was not a risk to herself or others. *Id.* at 683.

Dr. Beard stated Wallace was talkative, she was oriented to time, person, and place, her speech was coherent and her thought process was logical, with tight association. Her judgment and insight were questionable, she had adequate recent and remote recall, and her attention span and concentration were sustained. (R. 11, PageID #: 686.) Wallace reported to Dr. Beard that she was good at baby-sitting, and was currently a sitter for a three-year-old. She enjoys working at a computer, and uses Facebook often. Wallace reported that she liked the new vampire movies, and she enjoys reading on a computer. *Id.* Wallace also reported continuing anger problems with her boyfriend and her sister. She was assessed with Mood Disorder, NOS; and borderline intellectual functioning. *Id.* at 687. Wallace was not taking Depakote at the time. *Id.* at 688,

During a February 12, 2014, pharmacologic management visit with Kolawole Tiwalola, M.D., Wallace was started on Depakote to help with impulse control, agitation, and mood stability. (R. 11, PageID #: 716.) Dr. Tiwalola reported Wallace was cooperative, she was oriented to time, person, and place, her thought process was logical and organized. There was no evidence of paranoia or delusions, although she reported hallucinations, she had normal recent and remote recall, and her attention span and concentration were sustained. The doctor assessed that she was not a risk to herself or others. Dr. Tiwalola's impression was that Wallace was stabilizing. *Id.*

On March 26, 2014, Wallace reported to Dr. Tiwalola at least a 50% improvement in her mood with Depakene, and that family members informed her of the improvement with her mood and anger. (R. 11, PageID #: 732.) Dr. Tiwalola reported Wallace was cooperative, she was oriented to time, person, and place, her thought process was logical and organized. There was no evidence of paranoia or delusions, she had normal recent and remote recall, and her attention

span and concentration were sustained. The doctor assessed that she was not a risk to herself or others. *Id.* Dr. Tiwalola advised Wallace to continue her medication. *Id.* at 733.

During a May 12, 2014, counseling visit with Dr. Ratner, Wallace reported that she was feeling better, she and her boyfriend had moved, and there was a lot less arguing. Because of contracting Hepatitis A, Wallace needed to cease the Depakote. (R. 11, PageID #: 772.) However, by May 27, her liver condition had improved, and she started a new medication (Latuda). *Id.* at 783.

On July 14, 2014, Wallace had a pharmacologic management appointment with Leslie Powell, CNP, and described herself as "good," and denied "fighting more lately," although she reported "zombie like things" were staring at her. She reported that Vistaril helped really well with her anxiety, but sought a change in medication because it makes her sleepy. Wallace reported her panic attacks were lessening overall. She said she was sleeping better with Latuda, but she reported that she did not always take her medication, although it helped with anger. (R. 11, PageID #: 788.) Powell's impression was that Wallace's symptoms were in partial remission, and she was stabilizing. The dosage levels were adjusted for both medications. *Id.* at 789.

At an August 29, 2014, visit with CNP Powell, Wallace reported she was good, although she had stopped taking her Latuda, and occasionally took Vistaril for anger management. (R. 11, PageID #: 798.) Wallace said that people seem to notice she has been nicer. *Id*. She had dreams of being attacked by zombies. Wallace reported that most of her stress was waiting for a hearing on her Social Security claim. *Id.* She reported that she had lost twenty-two pounds going to the gym, and that her health is good. Powell reported that Wallace's behavior was cooperative, calm, and pleasant, that she was oriented to time, person, and place, that her mood was good (feels

happy), and her recent and remote memory were normal. *Id.* Powell's impression was that Wallace was stabilizing. *Id.* at 799. Her medications were adjusted. *Id.* at 799-800.

At a March 26, 2015, visit with Morgan Wiggins, CNP, Wallace reported that she had stopped babysitting, because her boyfriend hit the child during an argument with her. (R. 11, PageID #: 815.) She was taking her medications (trileptal, and vistaril as needed for anxiety), but denied a trial with an anti-psychotic. Wallace's behavior was cooperative, she was oriented to time, person, and place, her mood was euthymic, and her recent and remote memory were grossly intact. *Id.* Her mood was stable, and her current medications were continued. *Id.*

### B.  Medical Opinions Concerning Claimant's Functional Limitations

Mitchell Wax, Ph.D., provided a psychological evaluation of Wallace on August 21, 2013. (R. 11, PageID #: 431-436.) Dr. Wax reported that the background information provided to him noted she had ADHD and depression, difficulty following directions, and anger problems. *Id.* at 431. Dr. Wax stated that Wallace's "chief complaint about why she is not able to work is that she has anger problems and has ADHD." *Id.*

Wallace reported to Dr. Wax that she had graduated from high school special education classes. Wallace said she was asked to leave college in her second semester, because she was failing her math class and was getting "frustrated and annoyed when I was in tutoring." (R. 11, PageID #: 432.) She stated she was asked to leave in 2011 "until I could get my emotions together." *Id.*

Wallace told Dr. Wax she had been seen at Applewood Counseling Center ten years earlier for depression. She stated she had recently started counseling again at Metro Hospital. (R. 11, PageID #: 432.) Wallace indicated she had never worked, because of panic attacks and she cannot be around many people. *Id.*

8

Concerning her daily activities, Dr. Wax stated Wallace "was vague about how she spends a typical day." (R. 11, PageID #: 433.) Wallace reported that she is not allowed to cook because she walks away from the stove, and things burn, and although she can cook with a microwave, her mother usually cooks. She spends a good part of each day watching television. *Id.* She does not read, and has no interests, hobbies, or friends. *Id.* She has panic attacks and does not like being out of the house by herself. *Id.*

Dr. Wax reported that Wallace's speech was logical, coherent and goal directed. (R. 11, PageID #: 433.) She told the doctor she got angry six times a month, at which times she yells and throws things. *Id.* During the examination, she was anxious and fidgety. She said she had panic attacks three to four times a month. *Id.* Dr. Wax noted, "Panic disorder with agoraphobia is noted though her description of hallucinating and seeing zombies is bizarre." *Id.*

Dr. Wax assessed Wallace's cognitive functioning "in the low average range of intelligence," and noted she was oriented to person, place, time and situation. (R. 11, PageID #: 434.) She has difficulties with math. There was no evidence of mental confusion, and her ability to concentrate was good. Dr. Wax stated although Wallace said she hallucinated when she has a panic attack (seeing zombies chasing her), "she has not sought mental health care for her hallucinating." *Id.*

Dr. Wax stated that no psychological testing was requested, nor conducted. Based on his interview with Wallace, Dr. Wax assessed her with Panic Disorder with Agoraphobia (300.02), and Personality Disorder with Dependent Avoidant and Histrionic Features (301.90). (R. 11, PageID #: 435.)

Dr. Wax provided a functional assessment that found Wallace able to understand, remember and carry out instructions, to maintain attention and concentration, and to perform simple as well as multi-step tasks. She is not persistent. (R. 11, PageID #: 436.)

Dr. Wax opined that Wallace would have difficulty responding appropriately to supervisors and coworkers in a work setting, based on her statements that she was asked to leave college after "blowing up at a math tutor," and that "she gets angry and throws knives at family members." (R. 11, PageID #: 436.) Dr. Wax also said that Wallace would not respond appropriately to work pressures, "based upon her description of daily functioning." *Id.* Dr. Wax noted that Wallace reported she has to be reminded to do household chores, and she does not complete tasks unless someone is with her. *Id.* Dr. Wax added the caveat that, because Wallace had no mental health history, "it is not know[n] if her description of daily activities is correct." *Id.*

Karen Terry, Ph.D., conducted a review of the medical record on September 13, 2013. (R. 11, PageID #:142-147.) Dr. Terry assessed Wallace had mild restriction of activities of daily living, and moderate difficulties in maintaining  social functioning and maintaining concentration, persistence or pace. *Id.* at 142. Dr. Terry noted that there was conflicting evidence in the record regarding Wallace's mental health limitations. *Id.* at 143. For example, medical records from MetroHealth document a history of ADHD without any limitations, plus Wallace did not report any mental health conditions or limitations at each exam at MetroHealth. *Id.*

Dr. Terry assigned "other weight" to Dr. Wax's opinions because "they seemed to conflict with the totality of the evidence in the file." (R. 11, PageID #:144.) Dr. Terry's RFC assessment was that Wallace was moderately limited in her ability to understand and remember detailed instructions, but she is able to comprehend, remember, and carry out simple and mildly

complex instructions that are brief in nature. *Id.* at 144-145. Wallace is also moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule and to maintain regular attendance and punctuality, to sustain an ordinary routine without special supervision, and to work with others without being distracted by them. *Id.* at 145. She is also moderately limited in her ability to complete a normal workday without interruptions from her psychological symptoms, and to perform without an unreasonable number or length of rest periods. *Id.*

Dr. Terry also assessed that Wallace was moderately limited in her ability to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them, and to maintain socially appropriate behavior and neatness and cleanliness. (R. 11, PageID #:145-146.) Dr. Terry noted that Wallace reports panic disorder when around other people, and a history of problems with interpersonal relationships and anger management. *Id.* at 146. Dr. Terry stated that Wallace "will perform optimally in a more solitary setting, where tasks do not require direct collaborative efforts with others for task completion and she is not required to interact with the general public." *Id.*

Further, Dr. Terry stated that Wallace was moderately limited in her ability to respond appropriately to changes in the work setting. Dr. Terry opined Wallace "retains the ability to perform routine job duties that remain static and are performed in a stable, predictable work setting; any necessary changes need to occur infrequently and be adequately and easily explained to her." (R. 11, PageID #:146.) Dr. Terry noted that Wallace would benefit from having an on-site supervisor available to monitor her or to provide guidance. *Id.*

In addition, Dr. Terry acknowledged that Dr. Wax's opinion was more restrictive than hers, but stated Dr. Wax's opinion "is without substantial support from other evidence of record, which renders it less persuasive. The CE examiner's opinion is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." (R. 11, PageID #:147.)

On reconsideration, Kristen Haskins, Psy.D., conducted a review of the medical record on February 11, 2014. (R. 11, PageID #: 170-176.) With the following exceptions, Dr. Haskins' assessment of Wallace was identical to Dr. Terry's. Dr. Haskins assigned "partial weight" to Dr. Wax's opinion because it seemed to conflict with the totality of the evidence in the file. *Id.* at 172. Dr. Haskins assessed that Wallace was markedly limited in her ability to interact appropriately with the public. *Id.* at 173. Dr. Haskins concurred in Dr. Terry's assessment of Dr. Wax's opinion. *Id.* at 175-176.


IV. TESTIMONY OF VOCATIONAL EXPERT

At the hearing, the vocational expert (VE) provided testimony. (R. 11, PageID #:  116-121.) The VE noted that Wallace had testified to working as a child care worker, and a babysitter, both of which would come under the same DOT code, 301.677-010, medium level exertion, with SVP of 3. However, the VE testified that Wallace's past work history did not rise to the level of substantial gainful employment. (R. 11, PageID #: 117.)

The ALJ posed a hypothetical question:

First off. I would like you to consider an individual of the same age, education, and past work as the claimant who can perform a full range of exertional work and that this hypothetical individual can perform simple, routine tasks consistent with unskilled work with no fast paced or high production quotas and with superficial interaction with both co-workers and supervisors and by superficial I mean of a short duration for a specific purpose and that this individual can

12

perform no direct work with the general public and by that I mean customer service type of work and can perform work with infrequent change where those changes can be easily explained. Given this hypothetical individual first off would this hypothetical individual be able to perform the claimant's past work as those occupations are either generally or actually performed?

(R. 11, PageID #: 117-118.) The VE responded, no. *Id.* at 118.

The ALJ then asked whether there would be any jobs for such a hypothetical person, and

the VE responded that such a person could perform a number of jobs:

This worker could perform work as a cleaner at the medium exertional level. The DOT is 323.687-010. The SVP is 2. It's unskilled. I'll only provide unskilled work at this time.

* * * * *

They exist statewide over 3,500 and they exist in the national economy over 500,000. Laundry worker could be performed by this worker. The DOT is 361.685-018 and the exertion is medium and the SVP is 2. It is unskilled. They exist statewide over 1,500 and they exist in the national economy over 450,000. This worker could perform work as a packer and they exist at light and medium. The DOT is 920.587-018. The SVP is 2. It is unskilled.

Q. And what level, exertional level is this DOT code?

A. Medium, and statewide it exists over 1,500 and it exists nationally over 300,000. These are just examples for this hypothetical worker you've described could perform.

(R. 11, PageID #: 118-119.)

The ALJ then modified the hypothetical, adding the limitation that the individual can

perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of

others or supervisory responsibility, asking the VE whether the hypothetical person would be

able to perform the jobs the VE had identified. The VE responded, yes. In response to a further

question, the VE clarified that those jobs generally have a supervisor on site. (R. 11, PageID #:

119.)

13

The ALJ then further modified the hypothetical, adding the limitation that the hypothetical individual would be off-task approximately twenty percent of the time, due to exacerbation of mental health symptoms. The VE responded that there would be no jobs for such an individual. (R. 11, PageID #: 119-120.)

The claimant's attorney asked, assuming the first hypothetical, but adding that the person would need redirection four times an hour, consistently, to remain on task, whether that would have any impact on employability. The VE responded that the jobs identified are learned rather quickly. The VE continued:

> They do not require any more than sometimes days but no more than 30 days to learn the task and be proficient at it, four times an hour for this worker to need redirection to maintain on task or perform the task. I think that worker would have difficulty with those types of jobs. A worker needing redirection four times an hour I wouldn't find that worker be [sic] at competitive work more so  in a work shop setting or in a very structured environment where that's the expectation.

(R. 11, PageID #: 121.) Counsel then inquired as to a situation where the hypothetical worker would have verbal outbursts at coworkers or supervisors every month or two, and the VE opined that this would be viewed as unacceptable work behavior, which is not tolerated. *Id.*

## V. ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in her September 18, 2015, decision:

> 1.  Born on October 9, 1989, the claimant had not reached the age of 22 as of August 1, 2011, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

> 2. The claimant has not engaged in substantial gainful activity since August 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

> 3.  The claimant has the following severe impairments: affective disorder (bipolar affective disorder), anxiety disorder (panic disorder with agoraphobia), organic

14

mental disorder, and personality disorder (personality disorder with dependent features) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned  finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  can perform a full range of exertional work, can perform simple routine tasks commensurate with unskilled work with no fast pace or high production quotas; with superficial interaction meaning of a short duration for a specific purpose with coworkers and supervisors; with no direct work with the general public (i.e. customer service type work); can perform work with infrequent change where changes are easily explained; can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on October 9,1989, and was 21 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have any past relevant work (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569,404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 11, PageID #: 78-80, 83-84.)

## VI. DISABILITY STANDARD

A claimant is entitled to receive disability benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Comm'r Soc. Sec. Admin.*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Comm'r Soc. Sec. Admin.*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

VII. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Comm'r Soc. Sec. Admin.*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Comm'r Soc. Sec. Admin.*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

VIII. ANALYSIS

Wallace briefs two issues for review:

1.  Whether the Administrative Law Judge erred in failing to grant appropriate weight to the opinion of examining physician[2] Mitchell Wax.

2. Whether substantial evidence demonstrates that the plaintiff meet, or equals, Listing 12.05(B) or Listing 12.05(C).

(R. 12, PageID #: 819.)

A. Weight of Opinion Evidence

Wallace argues that the ALJ failed to give appropriate weight to the opinion of an examining psychologist, Mitchell Wax, Ph.D. (R. 12, PageID #: 831-834.) Wallace contends that the ALJ improperly gave preferential weight to the opinions of two reviewing psychological consultants over the opinion of Dr. Wax. *Id.* at 831.

The ALJ has the responsibility for reviewing all the evidence in making her determinations. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). An ALJ must evaluate each medical opinion in the record. *Smith v. Comm'r Soc. Sec. Admin.*, 482 F.3d 873, 875 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ will consider any statements that have been provided by medical sources, whether or not based on formal medical examinations. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Although the ALJ reviews and considers all the evidence before her, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c).

The Sixth Circuit in *Gayheart* has explained the weight generally accorded to various types of medical sources:

---

[2] Mitchell Wax, Ph.D., is a psychologist, not a physician. *See, e.g.*, R. 11, PageID #: 436.

18

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), [20 C.F.R. §§ ] 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *id.* § 404.1502, 404.1527(c)(2).

*Gayheart v. Comm'r Soc. Sec. Admin.*, 710 F.3d 365, 375 (6th Cir. 2013); *see also Ealy v. Comm'r Soc. Sec. Admin.*, 594 F.3d 504, 514 (6th Cir. 2010). Nevertheless, state agency doctors are considered highly-qualified experts in disability evaluation, and the ALJ must consider their evidence. 20 C.F.R. §§ 404.1513a(b)(1); 404.1527(e). Although the ALJ generally accords more weight to a treating source over those of a non-examining source, for example, the ALJ is not prohibited from adopting the findings of a non-examining source. *See generally Ealy*, 594 F.3d at 514-515; *Smith*, 482 F.3d at 875.

The ALJ noted that the evidence of record did not include an opinion by a treating source. (R. 11, PageID #: 82.) Therefore, no medical opinion is deemed controlling. The ALJ discussed the weight given to Dr. Wax's opinion, and the agency consultants' opinions, as follows:

> The undersigned accords some weight to Dr. Wax's consultative, examining source opinion to the extent that it demonstrates the claimant has moderate limitations with the ability to understand, remember, and carry out instructions, and maintain attention and concentration. The undersigned finds that the totality of the evidence does not support Dr. Wax's further limitations that the claimant would have difficulty responding to supervisors and could not respond appropriately in a workplace setting. Dr. Wax appears to base his opinion on the claimant's statements that she was asked to leave college, she reports anger towards others and she has not held a job. As also noted by the claimant, she has no mental health history. She has been given the opportunity to attend counseling or therapy and has declined.

> The undersigned accords significant weight to the State agency psychological consultants' opinions . . . , which the undersigned has adapted and restated for clarification. The opinions are wholly consistent with MetroHealth treatment records that demonstrate the claimant is able to leave her home, engage in

19

conversation, sustain concentration to use a computer and be responsible for the care of a child, and attend public settings such as a gym.

(R. 11, PageID #: 82, internal citations omitted.)

As the opinion indicates, the ALJ considered Dr. Wax's opinion and did rely in part on it. The ALJ, however, determined that the evidence overall did not support further workplace limitations, which the ALJ indicated were based on Wallace's subjective complaints[3]. (R. 11, PageID #: 82; *see generally id.* at 436.) The ALJ's decision giving "some weight" to Dr. Wax's opinion demonstrates that the ALJ considered the lack of a treatment relationship, implicitly recognized the length, and the nature and extent, of the relationship (citing Dr. Wax's sole consultative examination, R. 11, PageID #: 81-82), and addressed the "supportability" of the evidence regarding Dr. Wax's opinions (R. 11, PageID #: 82). *See generally* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ further assessed the consistency of Dr. Wax's opinion, contrasting his opinion with the totality of the evidence and the psychological consultants' opinions. *Id.* The ALJ thus considered the proper factors in determining how much weight to give to Dr. Wax's opinion. *Gayheart*, 710 F.3d at 376; *Ealy*, 594 F.3d at 514; 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ's determination was well-supported by a thorough consideration of the medical evidence in the record. *See generally* R. 11, PageID #: 81-83. Reviewing the parties' arguments and the evidence of record on this issue, the court finds the decision is supported by substantial evidence.

---

[3] Dr. Wax himself expressed some hesitation in crediting Wallace's subjective allegations, noting Wallace had no mental health history, thus "it is not know[n] if her description of daily activities is correct." (R. 11, PageID #: 436.)

B. Listing 12.05

Wallace contends that the medical evidence demonstrates that the severe impairments meet, or at least equal, the requirements of disability under Listing 12.05(B) or Listing 12.05(C). (R. 12, PageID #: 835-838.) She asserts that the ALJ did not even consider Listing 12.05. Wallace states that her school transcripts "revealed WASI testing which included a Performance IQ of 59, Full Scale IQ of 83 and a Verbal IQ of 109." (R. 12, PageID #: 835, citing R. 11, PageID #: 308.) She argues that, based on the Performance IQ of 59, Listing 12.05(B) should apply. *Id*. Wallace asserts that, at the very least, Listing 12.05(C) should have been considered. *Id.* at 836. Wallace concedes, however, that there is no other intelligence testing in the record. *Id.* at 835. She also grants that the "IQ testing results here are debatable." *Id.* at 836.

The IQ tests that Wallace took before she reached the age of sixteen are no longer valid for purposes of Listing 12.05. IQ test results obtained between the ages of seven and sixteen are considered current for four years when the tested IQ is less than 40, and for two years when the IQ is 40 or above. *Hall v. Comm'r Soc. Sec. Admin.*, No. 4:13CV637, 2014 WL 2547791, at *7 (N.D. Ohio June 5, 2014) (citing 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.00(D)(10)); *see also Crum v. Comm'r Soc. Sec. Admin.*, No. 15-3244, 2016 WL 4578357, at *5 (6th Cir. Sept. 2, 2016); *Lete v. Colvin*, No. CIV.A.14-66, 2015 WL 4548736, at *3 (E.D. Ky. July 28, 2015) (citing cases); *Albright v. Astrue*, No. 5:10CV2274, 2011 WL 4833125, at *9 (N.D. Ohio Oct. 12, 2011).

The test results that Wallace references are cited in a school Evaluation Team Report dated April 19, 2005, when Wallace was fifteen years old. (R. 12, PageID #: 835, citing R. 11, PageID #: 308-309.) Based on the Performance IQ of 59, which claimant relies on (R. 12, PageID #: 835, 837), the test score was considered current for two years. *Hall*, 2014 WL

21

2547791, at *7; 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.00(D)(10)). Thus, the validity of the

IQ tests has expired, and there is no error in the ALJ's consideration of the Listings.


## IX. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge finds that the decision of the

Commissioner is supported by substantial evidence. The record evidence as discussed in the

ALJ's decision is such that "a reasonable mind might accept [it] as adequate" support for the

Commissioner's final benefits determination. *See Kirk*, 667 F.2d at 535 (quoting *Richardson*,

402 U.S. at 401). Accordingly, the undersigned recommends that the decision of the

Commissioner be **AFFIRMED**.


Date:  June 29, 2017                                    s/ *David A. Ruiz*
                                                       David A. Ruiz
                                                       United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of

Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the

specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas

v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).